*Ex Parte* JOFFEE, Petitioner.

In Vacation.—At Chambers, July 21, 1891.

1.  **Dramshops:** FREEHOLDERS CHARTER OF KANSAS CITY: PROVISIONS OF SELF-EXECUTIVE. The freeholders' charter of Kansas City of 1889 requires that an applicant for a dramshop license to secure the indorsement on his application of the board of police commissioners that he has proved himself a person of good moral character, and, whenever such application so indorsed shall be presented to the city auditor, he shall issue a license to such applicant. Said charter also provides that ordinances, etc., in force at the time this charter takes effect, and not inconsistent with the provisions thereof, shall remain in force, etc. These provisions are self-executive, requiring no provisions of the common council to render them efficacious.

2.  ———: ———: DRAMSHOP ORDINANCE OF 1888: REPEAL. The dramshop ordinance of 1888 as it appears in the revised ordinances of that year, being inconsistent with the freeholders' charter, as to the prerequisites of the granting of a dramshop license, is in so far repealed by said charter.

3.  ———: ———: BOARD OF POLICE COMMISSIONERS. The freeholders' charter has conferred upon the board of police commissioners full and exclusive power over the subject-matter of the grant and revocation of city dramshop licenses, and the propriety of the issue of such license in any given case is a matter solely within the discretion of the board ; and it has likewise, as shown by the history of its adoption, left with the mayor and common council the power to fix the amount of the charge for such license.

4.  **Definitions:** "LIKEWISE" IN CHARTER OF KANSAS CITY: CONSTRUCTION. The word "likewise" in section 1 of chapter 111 of the freeholders' charter of Kansas City means "in like manner, also ;" and every grant of power which follows the exception in said section is also and *in like manner* as much subject to its operation as all the powers conferred by the words which precede.

5.  **Construction :** RULES OF, AS TO REPEALS AND INCONSISTENCY OF FORMER AND LATTER STATUTES. In the opinion the following rules of construction are cited *arguendo* and applied :

    (1)  An affirmative enactment of a new rule implies a negative of whatever is not included or is different ; and, if by the language used, a thing is limited to be done in a particular form or manner, it includes a negative that it shall not be done otherwise.

(2)    If two statutes can be read together without contradiction or repugnancy or absurdity or unreasonableness, they should be both read together and both have effect.

(3)    An intention will not be ascribed to the law-making power to establish conflicting systems upon the same subject, or to have in force provisions of law by which the legislative will may be thwarted and overthrown.

(4)    When the mode in which the municipal power of a corporation upon any given subject can be exercised is prescribed by the charter, that mode must be followed.

(5)    If two inconsistent acts be passed at different times, the last is to be obeyed, and, if obedience cannot be observed without derogating from the first, it must give way.

(6)    Where a statute expresses first a general intent and afterwards an inconsistent particular intent, the latter will be taken as an exception from the former and both will stand.

### Original Proceedings by Habeas Corpus.

PETITIONER DISCHARGED.

No briefs filed.

SMITH, P. J.—It appears from the petition, return and accompanying exhibits that the circuit court of Jackson county in a certain proceeding pending before it declared the licenses under which the petitioner was conducting the business of dramshop keeper in a certain block in Kansas City to be void, and adjudged and decreed that he be enjoined "from maintaining or operating a dramshop" until he obtain a valid license from the county court of Jackson county and the auditor of Kansas City. The petitioner subsequently obtained licenses respectively from the county court of Jackson county and the auditor of Kansas City, the former of which is conceded to be valid. Subsequently, upon an information filed charging the petitioner with violating the injunction, the court caused an order of commitment to be entered of record, which amongst other things alleged that the petitioner "under color of a void dramshop license from the auditor of Kansas City issued

on the first day of June, 1891, did wilfully disobey the order and decree of injunction made by this court on the twenty-third day of May, 1891, by maintaining and operating a dramshop *and by selling*, furnishing and otherwise disposing of, in quantities less than one gallon, wine, beer, brandy, whiskey and other fermented and spirituous liquors * * * when he had not obtained the written consent of a majority of the property-owners within the block or square and fronting on the street where said dramshop was proposed to be opened as required by the 'revised ordinances of 1888 of the City of Kansas, now Kansas City,' before receiving a license from the city auditor of Kansas City, though he had paid the fee therefor required by sections 295 and 296 of said ordinance. For the violation of said order on each day he is so found guilty, the court enforces a fine of $5, amounting in gross to the sum of $10, and the sheriff of the county is ordered to take and seize him, the said George Joffee, etc. The petitioner while in custody of the sheriff under the order of the commitment makes his application to me, one of the judges of the Kansas City Court of Appeals, for his discharge under the writ of *habeas corpus*."

The petitioner's contention is that so much of the ordinances of 1888, set forth in the order of commitment, as requires an applicant for a dramshop license to first obtain the written consent of the majority of the property-owners within the block or square and fronting on the street where the dramshop is proposed to be opened, and also to produce to the city auditor the certificate of the city assessor showing the owners of the property whose consent is required to be obtained, before a dramshop license can issue to him, is repealed and superseded by the provisions of the charter framed by the "board of freeholders," and adopted at the special election in 1889, and that, therefore, the matter alleged in the order of commitment does not in point of law amount to a contempt. This contention presents

what seems to be the underlying and decisive question which I am called upon to determine. By subdivision 13, section 1, article 3, of the amended charter of the City' of Kansas, approved March 24, 1875, power was conferred upon the common council to license, tax and regulate tippling houses and dramshops. In the exercise of the power thus conferred the common council passed the ordinance just referred to. This ordinance as originally passed made no reference to the charge for dramshop licenses. But, in the revised ordinances of the city of 1888, the said ordinance which had been previously passed is found under chapter 14, in relation to the licensing and regulating of dramshops.

This was the state of the ordinances of the city in respect to the licensing and regulating dramshops when the present charter was adopted. The latter declares: "Before an application for license to keep a saloon, beer house, tippling house or dramshop shall be received or filed by the city auditor, there shall be indorsed thereon a certificate signed by the board of police commissioners that such applicant has proved himself to be a person of good moral character. Whenever such application is presented to the board of police commissioners such board shall cause notice in writing to be served by a policeman upon every resident property-owner in the block where such saloon, beer house, tippling house or dramshop is proposed to be located, designating a day, not less than five days nor more than ten days after service of such notice, when remonstrances, if any, against the issuance of such licenses will be heard by such board. Whenever such application so indorsed as aforesaid by said board of police commissioners shall be presented to *the city auditor he shall* issue a license to such applicant." Charter, 1889, sec. 33, art. 17. By the first section of the article just referred to it is further provided : "All ordinances, regulations and resolutions in force at the time this charter takes effect and

not inconsistent with the provisions thereof shall remain and be in force until altered, modified or repealed by the common council." The article from which these two sections have been quoted embraces forty-four sections which relate to nearly as many diverse and dissimilar subjects. These charter provisions are nearly all self-executive, requiring no action of the common council to render them efficacious. It must follow that, if the ordinances recited in the order of commitment are inconsistent with the provisions of said section 33 of the charter, the former must be held to be displaced and repealed.

The ordinances, to which reference has been made, by the clearest implication prohibit the city auditor from issuing a license before the applicant has obtained the written consent of the majority of the property-holders and has presented the certificate of the city assessor as is therein imperatively required. The charter introduces a radical change—a wide departure, in the mode and manner in which city dramshop licenses were to be applied for and obtained from that which was provided in the pre-existing ordinances. The freeholders' charter invested the board of police commissioners—a body created by the statute of the state—with a power *quasi* judicial in its nature, to require every applicant for a dramshop license to prove himself to be a person of good moral character before he is entitled to receive such license. And when the applicant had made that proof before this tribunal, and its certificate to that effect is indorsed on his application and presented to the city auditor, the mandate of the charter is that *he shall issue a license to such applicant.* But though the applicant be armed with requisite certificate of good character, yet, if he does not meet the requirement of the ordinance in respect to obtaining the consent of the property-owners, the city auditor must deny him a license, notwithstanding the mandate of the charter. The ordinance prohibits the city auditor from

issuing a license under conditions where the charter requires that he shall issue it. The inconsistency between the charter and the provisions of the ordinance thus becomes quite apparent.

It is well settled that an affirmative enactment of a new rule implies a negative of whatever is not included, or is different; and if by the language used a thing is limited to be done in a particular form or manner it includes a negative that it shall not be done otherwise. Sutherland on Stat. Const., sec. 140; *Wells v. Supervisors*, 102 U. S. 635; *Chandler v. Hann*, 83 Ala. 390. Any regulation prescribing the conditions upon which a dramshop license may issue which requires the applicant therefor to obtain the written consent of the majority of the property-owners in the block where it is proposed to open the dramshop, and in addition thereto that the tribunal controlling the issue of such license gives the property-owners notice to appear and enter their objections, if any they have to the issue of the license, to which they have already consented, would be justly regarded as unreasonable, if not absurd, in its requirements; and yet this is just what is required by the said ordinance and charter, if both are in force. If two statutes can be read together without contradiction, or repugnancy or absurdity or unreasonableness, they should be read together and both will have effect. An intention will not be ascribed to the law-making power to establish conflicting systems upon the same subject, or to leave in force provisions of law by which the legislative will may be thwarted and overthrown.

It is to be further observed that said section 33 of the city charter clothes the board of police commissioners with the power not only to pass upon the moral character of an applicant for a dramshop license, but goes further and invests it with power to cause notice in writing to be served upon every resident property-owner in the block where a dramshop is proposed to be located, designating a day when remonstrances against

the issuance of such license will be heard by such board. Though the applicant may prove himself to be a person of good moral character, yet, if the property-owners or any of them can show any sufficient cause why a license should not issue, then in such case the board has the clearly implied power to decline making an indorsement of its certificate on the application to the city auditor, and thus to defeat the issuance of the license. It seems to me quite obvious that section 33, article 17, and section 34, article 12, of the city charter has conferred upon the board of police commissioners the full and exclusive power over the subject-matter of the grant and revocation of city dramshop licenses.

The propriety of the issue of a city dramshop license in any given case is under the charter a matter solely within the discretion of the board. When the mode, in which the power of a municipal corporation upon any given subject can be exercised, is a prescribed by the charter, that mode must be followed. *First Presbyterian Church v. City*, 36 Ind. 338; *Moberly v. Wright*, 19 Mo. App. 271; Dillon on Mun. Corp. 328, 316, note 1; *State v. Ferguson*, 33 N. H. 424. Where a statute prescribes an exclusive rule it implies a negative, and repeals whatever of existing law stands in the way of its operation. Sutherland on Stat. Const., sec. 139. Tested by the rules of construction just adverted to, it seems to me that the charter accomplished the repeal of the ordinances recited in the order of commitment. It is quite true that the charter does not meet and cover all the provisions of the dramshop ordinances of 1888. It does not in the least encroach upon the provisions which relate to the charge for the license. This matter was very properly left subject to the control of the common council by ordinance. The board of free-holders submitted to a vote of the people several alternative propositions embraced in separate sections of the charter, among which was section 44, which provided : "Every license for keeping any saloon * * *

shall be $250," which was defeated. It is thus seen that the people while adopting the section of the charter investing the board of police commissioners with the power of control, in respect to granting and revoking dramshop licenses, declined to take from the mayor and common council the power to fix the amount of the charge for a dramshop license, by defeating the adoption of the alternative section of the charter proposed. Because these provisions in respect to license charges were not encroached upon by the charter as adopted, it by no means follows that the other provisions which are inconsistent with it are unaffected. It is a mistake to suppose that because the charter does not purport to cover the subject covered by the ordinances in question that the former did not repeal the repugnant provisions of the latter. The charter of a city bears the same relation to the ordinances of a city that the constitution of the state bears to its statutes, and the general rule applicable to unconstitutional statutes is, I think, applicable to the case under consideration. If two inconsistent acts be passed at different times, the last is to be obeyed, and, if obedience cannot be observed without derogating from the first, it is the first which must give way. Every act is made either for the purpose of making a change in the law, or for the purpose of better declaring the law, and its operation is not to be impeded by the mere fact that it is inconsistent with some previous enactment. A partial repeal of a statute may be accomplished by a partial repugnancy to another statute—the rule being that the repeal extends only so far as the repugnancy extends and leaves all the remainder in full force. *Quinnette v. St. Louis*, 76 Mo. 402; *County Court v. Griswold*, 58 Mo. 199; *Manker v. Felliber*, 94 Mo. 430; *Dean v. Bliss*, 5 Beav. 582; *VanRensselaer v. Snyder*, 9 Barb. 308; *Harrington v. Trustees*, 10 Wend. 550; *Bowen v. Lease*, 5 Hill (N. Y.) 225; *Williams v. Potter*, 2 Barb. 316.

The provisions of the ordinances fixing the license charge is not so essentially and inseparably connected

in substance with that requiring the applicant for a dramshop license to obtain the written consent of the property-owner that one cannot stand without the other. I think the latter case stands though the former fall. There is no force in the point made in the argument to the effect that "if section 33 of chapter 17 of the charter is construed as I have indicated that then the provisions of section 1, chapter 111, of that instrument, which relate to the powers of the common council to regulate, suppress, license and tax saloons, is void, for the very manifest reason that the last-named section expressly provides that the "mayor and common council shall have the management and control of the finances and other property, real, personal and mixed, belonging to the corporation, *except as is in this charter otherwise provided, and likewise shall have power by ordinance*" to do the several things thereafter in that section specified. It may be further observed in this connection that in order to ascertain what power the mayor and common council possess by ordinance it is necessary to understand the force and effect of the word "likewise," as it appears in that part of section 1 which has just been quoted, for the measure and manner of their power by ordinance is determinable by that word. This word is defined by standard lexicographers to mean "in like manner, also, moreover, too; and, occupying the position and relation it does to the other words of the section, it furnishes an inerrable guide to the true construction of the section in its entirety. It will be seen that all the powers conferred in the section upon the mayor and common council by the words which either precede or follow the word "likewise" are subject to the common exception, that is to say "except as in this charter is otherwise provided." Every grant of power which follows the words of this exception is also and *in like manner* as much subject to its operation as all the powers conferred by the words which precede it. There is no distinction. It is too plain for argument

Ex Parte Joffee.

that had the alternative section fixing the charge for dramshop licenses hereinbefore referred to been adopted and become a part of the charter that it would have operated as a limitation and restriction on the general power granted by section 1 of chapter 111 to the mayor and common council, to regulate, license and tax saloons by ordinance. This alternative section proposed to withdraw from the general powers of the mayor and common council, enumerated in said section 1, the special power to fix by ordinance the amount of the dramshop license tax. And it is equally clear that the provisions of section 33 of article 17 not only accomplished the repeal of sections 297 and 298 of the revised ordinances of 1888, but also limits and qualifies the operation and effect of the words in section 1 conferring the powers which have just been specified. The former is no more than a limitation upon the latter. The general power to suppress, license and regulate dramshops is limited and excluded to the extent specially provided in said section 33, or, stated in another way, the special power withheld by section 33 is not included in the general grant contained in section 1 of the charter.

The rule of construction applicable here is that where a statute expresses first a general intent, and afterwards an inconsistent particular intent, the latter will be taken as an exception from the former, and both will stand. Sutherland, Stat. Const., sec. 153. It must needs follow that the city licenses received by the petitioner were valid and conferred upon him full authority to sell the intoxicating liquors, which sale was charged and adjudged as constituting a violation of the injunctive order, and that the matter alleged in the order of commitment did not in point of law amount to contempt.

It results from these considerations that the petitioner must be discharged, and it is so ordered.